UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SANDY ALEXANDER, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 19 C 2461 |
| | ) | |
| MANROLAND, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

**CHARLES P. KOCORAS, District Judge:**

Before the Court is Defendant Manroland, Inc.'s ("Manroland") motion to dismiss Plaintiff Sandy Alexander, Inc.'s ("Sandy Alexander") amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). Additionally, Manroland moves to strike Sandy Alexander's allegations concerning settlement discussions pursuant to Federal Rule of Civil Procedure 12(f) and Federal Rule of Evidence 408. For the following reasons, the Court grants the motion to dismiss and denies the motion to strike.

## BACKGROUND

For purposes of this motion, the Court accepts as true the following facts from the amended complaint. *Alam v. Miller Brewing Co.*, 709 F.3d 662, 665–66 (7th Cir. 2013). All reasonable inferences are drawn in Sandy Alexander's favor. *League of Women Voters of Chicago v. City of Chicago*, 757 F.3d 722, 724 (7th Cir. 2014).

*The Parties*

Plaintiff Sandy Alexander is a leader in integrated multi-channel communication solutions and one of the world's premier commercial printing companies. Sandy Alexander is a New Jersey corporation with its principal place of business in Clifton, New Jersey.

Defendant Manroland sells printing presses manufactured in Germany by an affiliated company. Manroland is a Delaware corporation with its principal place of business in Westmont, Illinois.

*The Contract*

On or about April 27, 2017, Sandy Alexander and Manroland entered into a Machinery Contract ("the Contract"), in which Manroland agreed to sell Sandy Alexander a new Roland 700 Evolution DirectDrive High Speed Eight Color PLV Offset Printing Press with Coater and Color System Brunner with LED UV ("the Evolution Printing Press") for $3,413,000.[1] According to Manroland, the Evolution Printing Press is a state-of-the-art machine that sets the standard for printing press technology and gives printing companies "unprecedented levels of efficiency, productivity, operation and quality."

---

[1] As part of the Contract, Sandy Alexander also agreed to upgrade the hardware and software of the existing Roland 700 Evolution DirectDrive High Speed Six Color Non-Perfecting Press ("the Non-Perfecting Press") and to purchase a System Brunner color-control unit for the Evolution Printing Press and Non-Perfecting Press, costing an additional $250,000. As of the date of filing the amended complaint, Manroland has not performed these services, so Sandy Alexander has not paid the $250,000. However, this portion of the Contract is not at issue for purposes of this opinion.

2

The Evolution Printing Press is a complex machine, weighing in excess of one hundred tons and measuring roughly sixty feet long, eleven feet wide, and seven feet tall. One of the most important characteristics of the machine is its ability to "perfect," meaning that it can print on both sides of a sheet of paper at the same time. For a non-perfecting printing press to print on both sides, employees need to run paper through the printing press first on one side, then manually flip the sheet of paper and re-run the sheet through the printing press.

Another feature of the Evolution Printing Press is its software that allows for Manroland and Sandy Alexander to monitor its operation and diagnose any problems remotely twenty-four hours a day, seven days a week. If there is a problem with the machine, the Evolution Printing Press will notify both Manroland and Sandy Alexander of the problem in real time.

As part of the Contract, Manroland agreed that the Evolution Printing Press would "substantially conform to the description of the [Evolution Printing Press] as set forth in the [Contract]." Manroland further agreed that "all or any portion of the [Evolution Printing Press] erected under [Manroland's] supervision will, under normal use and service, be free of defects in material and workmanship." They agreed that such warranty would be in place for at least thirty-six months, but in no event for more than forty-two months from delivery of the Evolution Printing Press. In the event of any non-conformity with these warranties, Manroland agreed to repair the Evolution Printing Press, replace it, or issue a refund to Sandy Alexander.

*The Delivery and Installation*

On October 16, 2017, Manroland delivered the Evolution Printing Press to Sandy Alexander. Due to the size of the printing press, it was delivered in parts and assembled onsite by Manroland's mechanics and engineers.

On or about December 20, 2017, Manroland completed the assembly and installation of the Evolution Printing Press, but the machine required an additional two months of troubleshooting before the parties could run the first customer print order on it. On February 15, 2018, Manroland and Sandy Alexander completed the first customer print order.

*The Evolution Printing Press's Failures*

At approximately 2:00 A.M. on April 17, 2018, the Evolution Printing Press suffered a catastrophic failure. A steel shield inside the press fell loose, jamming the massive gears that turn the press. The machine seized up completely, as all the shear bolts and dowel pins had shattered, gears cracked from the force exerted when the steel shield wedged between them, and nearby steel grippers were mangled beyond repair. The press was so irreparably damaged that the sheet of paper running through the press at the time of the failure could not be removed by Manroland's repairmen for five days.

Sandy Alexander's employees immediately notified their supervisor, Robert Tortorello ("Tortorello"), who reported the issue to Manroland by telephone. That day, one of Manroland's U.S.-based engineers arrived at Sandy Alexander to diagnose the

problem. The problems were so significant that the U.S.-based engineers could not assess or repair the problems on their own.

The following day, Ertugrul Seker ("Seker"), one of Manroland's senior engineers based in Germany, went to Sandy Alexander's New Jersey pressroom to inspect the Evolution Printing Press. Manroland identified the extensive damage to the machine, confirming that a weld broke inside the Evolution Printing Press that caused the steel shield to fall free and create a blockage that immediately seized up the machine and destroyed critical parts of the press. For the next seven weeks, Manroland disassembled the Evolution Printing Press on Sandy Alexander's pressroom floor in an attempt to identify and repair the damage. Manroland ordered and installed replacement parts, created custom parts, and modified pieces of the printing press.

After seven weeks of repairs, Sandy Alexander was able to use the Evolution Printing Press to complete customer orders on June 1, 2018. However, the repairs were short lived. Over the next three months, the machine suffered from seven more incidents that lead to the machine being down for days or weeks at a time.

On September 11, 2018, Manroland CEO Sean Springett ("Springett") came to Sandy Alexander to discuss the pervasive problems with the Evolution Printing Press. During the meeting, Tortorello asked Springett whether it was normal for the machine to suffer from so many problems. Springett stated that it was not normal. For a week following this meeting, Manroland stationed an engineer in Sandy Alexander's

pressroom to monitor the Evolution Printing Press, but the machine continued to operate with problems.

On January 7, 2019, the Evolution Printing Press suffered a second catastrophic failure where the perfector was damaged and went down. Manroland's technician was not able to repair the machine so that it operated in accordance with its intended usage. Rather, the repairs enabled the printing press to operate in "straight print only," meaning that it could no longer "perfect" and could only print on one side. This problem persisted for approximately six weeks, costing Sandy Alexander more than twice as much to run a print order as it would have otherwise.

*Post-Failure Discussions*

On January 16, 2019, Springett met with Sandy Alexander CEO Michael Graff ("Graff") to discuss the problems with the Evolution Printing Press. Springett stated that it was costing Manroland a fortune to repair the machine and that he did not think they could ever completely repair it. As a solution, Springett offered to replace the Evolution Printing Press with a new printing press of the same model. During the delivery and installation period, Springett offered to provide Sandy Alexander a refurbished printing press at no cost, but with the option to purchase the machine at a discount once the Evolution Printing Press was installed. Springett also offered to forgive the $250,000 due to Manroland when it installed the System Brunner Color-Control Units and upgraded the Non-Perfecting Press.

In February 2019, Manroland retracted its offer, refusing to replace the Evolution Printing Press or provide any redress to Sandy Alexander other than to continue to service the faltering printing press. Instead, Manroland offered to sell Sandy Alexander a new Evolution Printing Press and apply a $650,000 credit to compensate them for the harm caused by the defective machine.

To date, the Evolution Printing Press continues to suffer weekly, if not daily, failures, despite Manroland's attempted repairs. However, Manroland now refuses to provide Sandy Alexander with information concerning the repairs and modifications that it has been making to the Evolution Printing Press.

Based on these events, Sandy Alexander filed their initial complaint on April 11, 2019, alleging claims for a breach of contract and a breach of the implied covenant of good faith and fair dealing. On June 14, 2019, Sandy Alexander amended their complaint, dropping the breach of the implied covenant of good faith and fair dealing claim. According to the amended complaint, Sandy Alexander is seeking $3,413,000 in damages for the cost of the Evolution Printing Press and approximately $2,250,000 in consequential damages. Manroland filed the instant motions to dismiss and strike on June 28, 2019 and July 23, 2019 under Federal Rules of Civil Procedure 12(b)(6) and 12(f).

## **LEGAL STANDARD**

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) "tests the sufficiency of the complaint, not the merits of the case." *McReynolds v. Merrill*

*Lynch & Co.*, 694 F.3d 873, 878 (7th Cir. 2012).  The allegations in the complaint must set forth a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Plaintiffs need not provide detailed factual allegations, but they must provide enough factual support to raise their right to relief above a speculative level.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  A claim must be facially plausible, meaning that the pleadings must "allow…the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The claim must be described "in sufficient detail to give the defendant 'fair notice of what the…claim is and the grounds upon which it rests.'"  *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient to withstand a 12(b)(6) motion to dismiss.  *Iqbal*, 556 U.S. at 678.

Federal Rule of Civil Procedure 12(f) allows the Court to "strike from a pleading … any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  Motions to strike are generally disfavored and are "within the discretion of the court."  *Tucker Firm, LLC v. Alise*, 2012 WL 252790, at *2 (N.D. Ill. 2012).

## **DISCUSSION**

Manroland moves the Court to dismiss Sandy Alexander's claim for consequential damages, as barred by their contract.  Further, Manroland moves to strike

8

Sandy Alexander's allegations in the amended complaint concerning settlement discussions. The Court addresses each motion in turn.

**I. Motion to Dismiss**

"Illinois has adopted the Uniform Commercial Code's rule that consequential damages such as lost profits may be limited or excluded by parties to a contract unless the limitation or exclusion is unconscionable." *CogniTest Corp. v. Riverside Pub. Co.*, 107 F.3d 493, 496 (7th Cir. 1997). Accordingly, barring unconscionability concerns, "[a] claim is properly dismissed if a limitation of remedies provision in a contract prohibits the claimant from recovering the damages sought." *Omron Elec. Components LLC v. Thinklogical, Inc.*, 2009 WL 4823905, at *4 (N.D. Ill. 2009) (citing *Factory Mut. Ins. Co. v. Bobst Group Inc.*, 2002 WL 1263991, at *3 (N.D. Ill. 2002)).

Manroland moves the Court to dismiss Sandy Alexander's claim for consequential damages because it was expressly waived in the Contract.[2] According to the Contract, the parties agreed that:

> In the event of any nonconformity to the warranty, only during the Initial Warranty Term, [Manroland's] sole responsibility shall be, at its sole option and expense, to repair and replace the part or parts of the Equipment not so conforming to the warranty or, if determined as necessary in the reasonable judgment of [Manroland], either remove the Equipment and refund that portion of the Purchase Price and the related transportation and installation costs, if any, actually paid by [Sandy Alexander] without interest, or replace the Equipment with other equipment conforming to the general description herein, less, in either

---

[2] Manroland's motion to dismiss also seeks dismissal of Count II of the complaint for breach of the implied covenant of good faith and fair dealing. However, Sandy Alexander dropped this claim in the amended complaint, which is the operative complaint for purposes of this motion. Accordingly, the Court will deny that request as moot.

9

> such case the value of the use of the Equipment by [Sandy Alexander] to the date of renewal or replacement, as the case may be.

The Contract also details Sandy Alexander's remedies for a breach of the agreement, stating:

> The remedies of Purchaser provided in this Contract are the exclusive and sole remedies of the Purchaser and Seller's sole responsibility and liability to Purchaser under this Contract. All remedies for loss of profits or consequential loss or damage and any and all other remedies for loss, damage, or liabilities of any nature whatsoever are hereby expressly excluded and Purchaser hereby expressly disclaims and waives same.

Sandy Alexander opposes the motion to dismiss, asserting that the consequential damages waiver is unconscionable and should not be enforced given Manroland's bad faith. They maintain that Manroland acted in bad faith by refusing to comply with the remedy of replacing the Evolution Printing Press or refunding the purchase price; attempting to coerce Sandy Alexander into purchasing a second Evolution Printing Press; and refusing to provide Sandy Alexander with information concerning repairs and modifications to their machine.

Even assuming these allegations are true, they are not enough to bring Manroland's conduct into the realm of unconscionability and render unenforceable the consequential damages waiver. "Unconscionability exists where one of the parties had no meaningful choice and the challenged contract terms are unreasonably favorable to the other party." *Lefebvre Intergraphics, Inc. v. Sanden Mach. Ltd.*, 946 F. Supp. 1358, 1371 (N.D. Ill. 1996). Here, the parties are both "sophisticated business parties," which casts doubt on any claimed compulsion to enter into the Contract. *HSBC Mortg. Servs.,*

*Inc. v. Equisouth Mortg., Inc.*, 873 F. Supp. 2d 923, 928 (N.D. Ill. 2012). Moreover, the terms of the Contract are not unreasonably favorable to Manroland, as it provides Sandy Alexander with several remedies, including to have the Evolution Printing Press repaired, replaced, or refunded—which Sandy Alexander has exercised.

Sandy Alexander's reliance on *Razor v. Hyundai Motor America*, 222 Ill. 2d 75, 97–101 (2006), is unavailing because the factual context is notably distinct from the instant case. In *Razor*, the plaintiff was an individual consumer who sued after her newly purchased automobile suffered several malfunctions. *Id.* at 80. The Court held that the consequential damages waiver found in her vehicle manual was unenforceable because it was not found in her purchase contract, she had no power to negotiate the purchase contract, and she was unable to review the warranty or consequential damages waiver found in the vehicle manual until she took delivery of the vehicle. *Id.* at 100–01. These concerns are not present in our case given that the parties are of relatively equal bargaining power and entered knowingly and willingly into an agreement that waived consequential damages. Accordingly, the Court will hold the parties to that agreement. Therefore, Manroland's motion to dismiss Sandy Alexander's consequential damages claim is granted.

**II. Motion to Strike**

Next, Manroland moves to strike Sandy Alexander's allegations concerning settlement discussions under Federal Rule of Civil Procedure 12(f) and Federal Rule of Evidence 408. According to Rule 12(f), "[t]he court may strike from a pleading…any

11

redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Rule 408 provides that evidence of settlement negotiations is not admissible "either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction." Fed. R. Evid. 408(a). However, "[t]he court may admit this evidence for another purpose, such as proving a witness's bias or prejudice, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution." Fed. R. Evid. 408(b). "The district court has broad discretion to admit [this] evidence for a purpose other than proving liability." *Zurich Am. Ins. Co. v. Watts Indus., Inc.*, 417 F.3d 682, 689 (7th Cir. 2005).

Manroland maintains that the allegations in Paragraphs 44, 48, and 49 of the amended complaint should be stricken under Rule 408 because they relate to Manroland's efforts to settle the dispute with Sandy Alexander and would chill parties from engaging in such discussions in the future. Sandy Alexander counters that these allegations fall within the exception to Rule 408 because they are not asserted to prove the validity of the claim, but for the purpose of proving Manroland's bad faith. The Court agrees with Sandy Alexander that proving bad faith would constitute "another purpose" under Rule 408, as this District has previously held that "evidence of unreasonably low settlement offers is admissible to show bad faith." *Jordan Mozer & Assoc., Ltd. v. Gen. Cas. Co. of Wisc.*, 2017 WL 4281056, at *3 (N.D. Ill. 2017).

Manroland argues that Sandy Alexander's allegations do not fit within the exception to Rule 408 because they do not arise "out of a dispute distinct from the one

in which the evidence is being offered." 1:19-cv-2461, Dkt. 58, Pg. 10. However, this is a mischaracterization of Seventh Circuit precedent. In *Zurich American Insurance Company v. Watts Industries, Inc.*, the Seventh Circuit stated that evidence is likely to be admitted under the exception to Rule 408 "when the settlement communications at issue arise out of a dispute distinct from the one for which the evidence is being offered." 417 F.3d 682, 689 (7th Cir. 2005). But this is merely a consideration that weighs in favor of admittance, not a requirement to admit evidence under the exception to Rule 408. Even absent a distinct dispute, this Court is convinced that the allegations fall within the exception to Rule 408. Accordingly, the motion to strike is denied.

## **CONCLUSION**

For the aforementioned reasons, the Court grants Manroland's motion to dismiss and denies the motion to strike. It is so ordered.

Dated: 2/25/2020

_____

Charles P. Kocoras
United States District Judge