## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

SANDY ALEXANDER, INC.,            )
                                  )
            Plaintiff,            )
                                  )
        v.                        )        19 C 2461
                                  )
MANROLAND, INC.,                  )
                                  )
            Defendant.            )

## MEMORANDUM OPINION

**CHARLES P. KOCORAS, District Judge:**

### BACKGROUND

On April 27, 2017, Plaintiff, Sandy Alexander, Inc., purchased a state-of-the-art Evolution Printing Press ("Press") from Defendant, Manroland, Inc. The Press was rated for 18,200 sheets per hour straight printing and 16,000 sheets per hour perfecting (printing on both sides of the paper at the same time). The cost of the Press was approximately $3,663,000.

The process of installing the Press at Sandy Alexander's plant in Clifton, New Jersey, began on October 16, 2017, and was completed on December 20, 2017. A testing period began on December 27, 2017. The date of the first commercial work was February 23, 2018.

The operation of the Press saw several operational failures of the Press, some of which were described as catastrophic. Many others resulted in significant downtime for

the Press, particularly in the first year of operation. The estimated cost of repairs incurred to date is in excess of $2,000,000, a figure supplied by Manroland.

The continuing problems with the Press produced a series of meetings and exchanges of information between the Parties throughout the course of time. At some point, Sandy Alexander requested that Manroland take the Press back and replace it because of the volume and severity of the problems being experienced. It once believed that the CEO of Defendant was in agreement with that solution. A later rejection of the proposed resolution doomed the Parties to litigation.

On April 11, 2019, Sandy Alexander filed its Complaint against Manroland, alleging that Manroland breached the Contract by selling Sandy Alexander a Press that did not conform to the Contract's specifications and by refusing to replace the Press or refund the purchase price to Sandy Alexander. Attempts at mediation failed.

## COURT PROCEEDINGS

Following the failure of mediation, Sandy Alexander filed a motion for an expedited trial. Manroland opposed scheduling a trial and, instead, filed a Motion to Appoint a Special Master pursuant to Federal Rule of Civil Procedure 53. This is what Manroland argued:

> At issue in this litigation is whether the Evo Press perennially malfunctions and whether it is properly operating. Resolution of these issues will likely require extensive expert testimony. Manroland continues to believe that – due to multiple complex issues requiring adjudication – a special master would be an ideal method to resolve the dispute between the parties in a cost-effective and equitable way . . . to make or recommend findings of fact on issues to be decided without a jury.

On November 26, 2019, the Court denied Sandy Alexander's motion for an expedited trial and granted Manroland's Motion to Appoint a Special Master. The case was referred to Magistrate Judge Young Kim for supervision of pretrial proceedings, including the selection of the special master.

Manroland proposed Raymond J. Prince as the Special Master. Sandy Alexander agreed to the choice. Mr. Prince was eminently qualified for the appointment. Mr. Prince had earned three degrees in printing management from reputable schools and universities and had sixty years of experience in the printing field. His expertise ranged from sheetfed printing and testing to color-control systems, matters relevant to the issues in the case. Mr. Prince had also provided confidential Technical Plant Assessments in the analysis of printers' operations. Mr. Prince has presented hundreds of lectures on technical problems in printing and authored almost 300 articles on printing matters. Additionally, he had provided expert services in roughly seventeen other litigations and arbitrations.

Special Master Prince was appointed Special Master on January 22, 2020. He established his own protocol for the investigation of the issues in the case. Mr. Prince's approximate four months of service as Special Master included the following conduct:

1. Review of pleadings, discovery material and supplemental information supplied by both Parties, whether volunteered or requested.

2. Seventeen interviews of fourteen people recorded by a videographer and by a stenographer.

3.      Follow-up comments and responses from counsel for the Parties after completion of the witness interviews and their departure.

4.      Second interviews of witnesses when more information was offered.

5.      Interviews of people not proposed by the Parties.

6.      Travels to and inspection of Sandy Alexander plants in Illinois and New Jersey.

7.      Responses by the Special Master to seventeen questions propounded by the Magistrate Judge of relevant issues and matters.

8.      Personal investigation of a piece of steel which had fallen off the Press in about January 2020, which Manroland had investigated but could not explain.

9.      Upon completion of his interviews, Special Master Prince conducted a 4-day test of the Press, with print test results given to the Parties both telephonically and in person on the last day of the test, along with a copy of the data collected during the print test. The test methodology employed had been used in the industry since 1978.

On April 26, 2020, Special Master Prince provided Sandy Alexander and Manroland with a copy of his 42-page Report and solicited any comments they wished to offer. In his tender to the Parties, the Special Master indicated he had 20 percent or more to write, mainly data. He told them he had been in two different hospitals four times but believed he had captured the direction of the study in the tendered report ("Report"). The Special Master invited comments to his Report from both the Plaintiff and Defendant, with the apparent intention to comment on their submissions.

4

Sadly, five days after sending out his Report and having been hospitalized, Mr. Prince passed away. He was never able to comment on any views held by the Parties, submit any additional data, or submit an affidavit under Rule 53(b)(3)(A) calling for disclosure of possible grounds for disqualification. In his obituary, Mr. Prince was described as having unparalleled passion for the industry.

The Report of the Special Master concludes that the Press was unreliable and did not operate consistent with the standards of the Contract between the Parties. Mr. Prince also concluded that Manroland acted in bad faith and supported his conclusion with seven paragraphs in response to the Magistrate Judge's question on the issue of bad faith.

Special Master Prince's Report set forth findings of fact and conclusions of fact and law as he determined them. Many of the findings and conclusions reflected in the Report were based on the Parties' business records made as the events they memorialized were occurring. Most of the records, if not all, were not made in anticipation of litigation or for any external purpose other than the accurate recordation they reflect. As such, they are neither controverted nor controvertible. These historical records form the bedrock from which the Special Master has drawn his professional conclusions.

Manroland has objected to the adoption of Special Master Prince's Report setting forth the work he performed, the findings and conclusions he reached, and the responses to the seventeen questions put to him by the assigned Magistrate Judge. The Report is claimed to be incomplete in critical areas and that the conclusions reached fail to logically follow from the evidence presented.

Other than the claimed deficiencies in the Report, the Court is unaware of any challenges to Special Master Prince's knowledge, proficiency, character, or fealty to fairness. His Report is particularly thorough and comprehensive and includes often elaborate answers to the Magistrate Judge's seventeen incisive questions. Qualitatively, the Report appears to be the equal of his experience and his reputation in the printing industry.

## FINDINGS OF FACT

The record in this case, based on the Special Master's findings of fact and conclusions of law, but also including other evidentiary sources as described, reflect the following:

1. During the first year of operation, the Press required more than 150 days of repairs, including 50 days when the Press was completely inoperable and approximately 40 more when it could not "perfect."

2. Between March 1, 2018, and May 31, 2019, Manroland's technicians were present in Sandy Alexander's pressroom for 219 days, a period which had only 315 total working days.

3. During 194 days of the 3/1/18 to 5/31/19 period, Manroland's technicians were working on the Press for more than 4 hours.

4. Within two months of the first commercial print work, the Press suffered what the Manroland Director of Service for North America described as "a catastrophic unplanned disaster."

6

5.    On September 21, 2018, the transferter (a thin piece of metal) dislodged during operation and ran through one of the printing units; the Press was not substantially damaged, and it was only a "near" catastrophic failure.

6.    On December 3, 2018, the drive (main) motor of the Press failed.  Although a temporary motor was provided, the Press could only be operated at reduced speeds for four weeks.  A ranking Manroland employee testified that this type of failure should never happen during the first year of operation of a press.

7.    On January 7, 2019, the Press crashed once again.

This latest failure prompted Michael Graff, the CEO of Sandy Alexander, to send the following transmission to the CEO of Manroland, Sean Springett, to notify him of the crash personally:

> Once again we find ourselves without the services of our press. Sandy Alexander has endured countless breakdowns, delays, lost opportunities and have [sic] lost hundreds of thousands of dollars.  This can not [sic] continue, [sic] We purchased this press based on your reputation and our experience.  We have been profoundly disappointed.  I do not think we need to revisit the litany of issues, they are extensive.  We would like you to take this press back and either replace it or we will seek alternative solutions.  This need [sic] to be resolved immediately.  I look forward to your response.

On January 16, 2019, the CEOs of the respective Parties, along with other party representatives, had a meeting to discuss the problems with the Press.  The Sandy Alexander executives agreed that CEO Springett of Manroland admitted that he did not think Manroland could ever completely repair the Press and offered to replace it.  Thinking it was a fair offer, Sandy Alexander was prepared to accept the offer.

7

Manroland denies the offer to replace the Press was ever made at the meeting.

Special Master Prince credited the statements of Sandy Alexander's executives, finding, "Mr. Springett's offer to replace the press with a new one and put in immediately a used, rebuilt one to take up production and sell the used one at a deep discount when the new press is installed was possibly a very good offer." Report at 14; *see also* Report at 11 ("Mr. Springett made the offer to replace the press and sell [Sandy Alexander] a used/rebuilt one at a reduced price. This offer was rejected by [M]anroland Germany about a month later.").

With the rejection of Sandy Alexander's willingness to accept a replacement press, the die was cast. The Complaint in this case was filed by Sandy Alexander in short order.

## ANALYSIS

The main issue framed by the pleadings is whether the Press operated at a level that substantially complied with the specifications set forth in the Machinery Contract, dated April 27, 2017. The record in this case establishes overwhelmingly that the Press has demonstrably failed to satisfy the warranties and requirements Manroland was obligated to provide to Sandy Alexander pursuant to Contract.

Much of the record relied on is composed of undisputed facts and experiences memorialized at the time. This history was not created by the Special Master. What is also true is that the Special Master's week-long test simply confirmed the unalterable record of performance, or non-performance, that had been amassed prior to his

8

appointment as Special Master.

Significantly, even the honest testimony of high-ranking employees of Manroland agree with the view of Sandy Alexander that the Press was a failure. Although the Parties do not agree that the Contract was breached, they acknowledge the existence upon which that determination is predicated. The key feature sought by Sandy Alexander in the Press was its reliability. This is reflected in some of the Sworn Interview of Tim Fischer, the Chief Financial Officer of Sandy Alexander, given on February 20, 2020:

> Q     How do you schedule when something is unreliable?
>
> A     How do you schedule? How do you tell clients when they come in? We have clients in here all the time. We have two clients in today who are waiting for the press to come up to color. They want to check it. And we have to tell them, 'Can't do it today, we have a problem.' It's embarrassing, and it's also very detrimental to our business going forward, because we don't have a backup press. Now, we do. It's inefficient, and we'll have to use it, you know, to get out of a bind, but we're just not in a position to be able to service our clients the way they expect us to . . ."

Greg Harris, Manroland's Director of Service for North America, testified in a deposition on October 17, 2019, about an experience with the Press within two months of the first commercial print work. He described it as a "catastrophic, unplanned disaster" and admitted the Press sold to Sandy Alexander suffered failures within its first year of operation that no press should ever have suffered. In the civil law, that is called an admission. In the criminal law, that would be called a confession.

Another of the defenses to the breach-of-contract claim is the number of

impressions produced by the Press.  Manroland argues that Sandy Alexander "has used the Press to generate close to 50 million impressions and likely collected millions of dollars in revenue from such use."  The inarticulated premise in this proposition is that each such impression was original and generated income.  Absent any facts and circumstances surrounding the creation and use of those impressions, the assertion of full and independent revenue generation by these impressions cannot stand.

As argued by Sandy Alexander, impression counts are not indicative of the quality of the Press's performance.  The impression count increases each time a sheet passes through the Press, whether the Press was running at reduced speeds, could not perfect, or suffered a malfunction ruining a print job or some portion of a print job.  Some jobs might have required a second run for some reason or other, doubling the costs and labor charges for one job.  This would have doubled the cost to do the job rather than the normal components for completion.  With the steady diet of repairs and breakdowns that have been documented, these considerations are not merely hypothetical.

In any event, numbers of impressions cannot eviscerate or diminish the indisputable breakdowns and repairs which the Press suffered during its use by Sandy Alexander.

Recordation of breakdowns and repairs were made by the Parties before the appointment of the Special Master as experiences with the Press were unfolding.  The records were made as the breakdowns were experienced.  As complete as these records were, they do not reflect the loss of jobs Sandy Alexander may have experienced due to

10

the unreliability of the Press or the loss of income it suffered.

The issues which are consequent to the determination of a breach are whether Manroland acted in bad faith, whether Sandy Alexander derived any value from its use of the Press, and the remedy to be awarded to Sandy Alexander.

Two of the principal challenges to the Special Master's Report and the conclusions he reached are as follows:

1.  "It is very common for new models of printing presses to have more service issues than new presses belonging to an older model because manufacturers have a learning curve in discovering and correcting service issues." Manroland Response to Plaintiff's Motion to Adopt Special Master's Report.

2.  The Contract does not establish an uptime specification or standards of reliability. In light of that alleged omission of a necessary standard, "the performance metrics of Sandy Alexander's other presses at its Clifton facility are appropriate benchmarks to judge the performance of the Evo press."

The argument that increased downtime and service calls should be expected to be high early on is unsupported by any probative or credible evidence. Indeed, the testimony of Greg Harris that the Press has not run consistently through the year and that the unpredictability was embarrassing for their respective organizations flatly refutes the assertion. After months to set-up the Press and test it, it defies common sense to expect more breakdowns than normal.

According to Manroland's records, in its first nine months of operation, the Press

required 81 "SM's."  SM's are service requests made by Manroland to Manroland Germany for repairs to the Press.  As stated by Special Master Prince in his Report, the "normal would be 2 up to 4 in a one-year period and not 81 suffered by Sandy Alexander. Keep in mind the other presses are quite old, especially the Heidelberg press.  Normally, a printer will build into pricing 2 to 4 percent downtime for mechanical issues."  Special Master Prince described the constant repairs needed by the Press as "unacceptable and very disturbing," indicative of reliability issues with the Press.

Manroland's suggested test for operational comparison purposes is Sandy Alexander's other presses in use, apparently irrespective of age, model and features.  In conducting his full 5-day print quality test, the Special Master used the Press Test Protocol established by the major trade organization in the printing industry, the "Printing Industries of America."  The basic test protocol has been used on thousands of presses since 1978.

The number of SM's that required a Manroland person is exceedingly large compared to other manufacturers of perfecting printing presses.  "If we look at a year or so of operation and compare it to an automobile, it would be equivalent to having your car in the dealership every week.  In addition, when the car would be ready would be unknown."  Special Master Report at 10.

In keeping with the Special Master's car analogy, imagine going to a Mercedes-Benz dealership and ordering the latest top-of-the-line S Class sedan.  Also imagine that, upon delivery, the salesperson told you the following:  "the only warranty of service and

12

performance we offer is the same as you enjoy for the 10-year-old second car you have in your garage that you intend to keep as a family spare. It does the job."

The comparison of Sandy Alexander's other presses is inapt. Sandy Alexander is a top-of-the-line printer, Manroland a top-of-the-line manufacturer, and the Press represented as a top-of-the line model. The sales price of approximately $3.6 million to Sandy Alexander did not provide a return to it of production or reasonable expectation of reliability of services. No reasonable buyer was deserving of the experience Sandy Alexander has realized to date with the Press it bought from Manroland. Mr. Harris's testimony affirms the sentiment, "no press should ever have suffered these types of failures . . ."

The $2 million plus that Manroland is estimated to have expended in the relative infancy of the life of the Press – more than half of the multi-million-dollar price tag – reflects more than words or descriptions of how bad the Press turned out to be.

Manroland cites to the absence of the Contract to contain specific uptime experiences or objective measurable criteria in order to measure performance reliability. Manroland says that "if the Evo Press did not meet Sandy's printing needs, it would not have continued to run tens of millions of impressions after the alleged catastrophic failures."

The precise question of whether the Press can operate at a level that substantially complies with the specifications for the Press was put to the Special Master. This was his response to the question:

It should be pointed out that none of the contracts that I have ever reviewed spell out productivity or quality specifications. The reason for this is due to the vast array of products that are printed – from simple laundry tags to elaborate annual reports. [M]anroland is considered to be a top of the line press used by very high quality printers. When looking at press operations ideally for a high quality printer the industry would expect at least a 95% or higher uptime for a new press. The 8C [M]anroland press is operating at a very low uptime and is not reliable. Only in the first months of operation the press printed 11 jobs. In the first year of operations, the press was down 50 days, could not perfect 39 days, and 150 days for repairs and modifications. (Figures supplied by Sandy Alexander.) This is unacceptable. A printer may bid on a large job two months ahead of the print date. Contracts are signed then when the print date happens the press cannot run. This causes many issues and costs to be incurred by the printer. No printer wants to purchase a press that cannot be counted on being in service.

In paragraph 11 on page 20 of his Report, the Special Master states the following:

"Sandy Alexander used the press approximately 40% of the time from install.  The sad part of that statement is that one could not predict when the press would be up and running."

Whatever precise measure is infused into the performance standards of the Contract for a new state-of-the-art press, an inability to use it for approximately 60% of the time and requiring in excess of 2 million dollars to repair cannot be said to be performing in satisfaction of the Contract.  Numbers of impressions produced and hours of uptime of operation may be the beginning of an inquiry of reliability, but it requires the examination of the history of the Press in its entirety to date to have a comprehensive view of the Press's performance.

As described in Sandy Alexander's Response to Manroland's Objection to

Special Master Prince's Report, "Special Master Prince did not require his decades of expertise to conclude that Manroland's 219 days of repairs to the Press between March 2018 and May 2019 constituted an 'unreasonable amount of time and number of attempts' to repair the Press." Like the facts cited in support, his conclusion is irresistible.

## MANROLAND'S EVIDENCE OF VALUE

The classic definition of "fair market value" is what a willing buyer would pay a willing seller, both with reasonable knowledge of the facts and neither under any compulsion to buy or sell. Nick Howard was retained by Manroland to "provide an uninspected summary appraisal" of the Press at issue in this case on October 18, 2020. Mr. Howard's opinion of fair market value, prepared and certified on October 23, 2020, was between $1,275,000 to $1,375,000.

Mr. Howard never inspected the Press and did not read or consider most documents and information available to Special Master Prince. The witness interviews, deposition testimony, and the voluminous and detailed records of breakdowns and repairs were also apparently unread. They were not commented upon in Mr. Howard's appraisal report and apparently not considered in the fair market value he arrived at.

Two of the fundamental assumptions made to determine Mr. Howard's estimate of value were based on Manroland's representations to Mr. Howard. He took what Manroland said at face value. This is what he assumed:

1. The press to be in good to excellent condition and all

mechanical/electrical/software/print issues are resolved;

2.    There are no hidden or unapparent conditions of the equipment that would render

it valuable.

No reference in the Howard report is made to the repair history of the Press. Reference is made to "a well-documented and damaged Evolution 708P in the Netherlands which . . . has not been used owing to its current state of being unrepaired and currently dismantled."  Even though the Evolution Press was a relatively new model, there was either insufficient time on Mr. Howard's part to explore the circumstances of the damage to the Netherlands press or inquire as to the repair history of the Press being evaluated for Manroland.

Reverting again to a car analogy, it does not take any sophistication when buying a used car (or similar piece of large equipment) to ask for information about miles travelled, whether the car was in prior accidents, its prior service experience, and the out-of-the-ordinary repairs.  Contrast the absence of such information from the appraisal report with the Special Master's Report and his concern about these matters.

At page 6 of his Report, the Special Master wrote:

No printer wants to purchase a press that cannot be counted on being in service.  If your automobile had as many SM's (Service Memos) as this press had, you would be a very frustrated driver.  (2/14/2020 answers to Special Master Questions and Answers p. 4).

The importance of reliability is particularly significant in the operating circumstances of Sandy Alexander.  This is what the Special Master wrote at page 11 of

16

the Report:

> Printers traditionally bid on work to be completed in a certain time frame. Thus, if a press is down, they can possibly switch the job to another press, if available. In the case of Sandy Alexander, there is not another 8-color perfecting press in the plant. In that case, the work has to shift to a 6-color press and has to run through the press twice thus doubling press time.

Mr. Howard's appraisal report omits the matter of reliability in either the analysis or the determination of fair market value. It is not reasonable to imagine a hypothetical buyer willing to pay over a million dollars for a machine with a track record of breakdowns and repairs as the Press which is the subject matter of this lawsuit. The best answer to the question of value is the actual marketplace for the Press. At this point, any value ascribed to the Press would be pure speculation.

Mr. Howard's appraisal report was not prepared in accordance with underlying principles necessary to support admissibility at a trial. The report is grounded on key assumptions given to Mr. Howard by his client. The complete record of the Press is abundant with hundreds, if not thousands, of pages of information that should have been used in the formation of scientific or legally defensible positions and conclusions. Mr. Howard's report makes no reference to this material, nor did he bother to look at or otherwise inspect – or have inspected – the Press.

Although Mr. Howard's credentials are impressive, his sole contribution of a range of values for the Press in October 2020 is not admissible and cannot be considered for any purpose in this case. He ignored a wealth of necessary and available information in the formation of his opinion and simply took the word of a party in interest that the

Press was in good to excellent condition and that there were no mechanical, electrical, software or print issues present. No mention is made of the Press's reliability, an issue central to its past performance experience, future operations, and present fair market value.

It is fundamental to appraisals of almost any kind of machine, device, or property that only like kind objects are to be compared. A press with a demonstrated record of $2 million in repairs over a limited period cannot be assumed to have a pristine record of operation when determining present-day worth. An opinion which fails to objectively consider a property's experience is unreliable and cannot be the basis of any legal finding to the contrary.

Although the Declaration of Nick Howard shall not be stricken, it would not be admissible at any trial. It has no evidentiary or probative value. It is simply not the product of a scientific or equivalent methodology.

The Contract provided that if the Press did not conform to the warranty, it was the sole option of Manroland to either repair or replace nonconforming parts or to provide a replacement or refund based on its reasonable judgment. Besides being constrained in its judgment by the standard of reasonableness, Manroland was obligated to act in good faith in its assessment of a remedy for the breach of the warranty of performance.

The Special Master concluded the Contract breach occurred in January 2019 when Manroland Germany told Defendant Manroland that they would not replace the Press. This decision came after the Press suffered numerous malfunctions, did not operate for

18

months, experienced numerous breakdowns and malfunctions and cost millions of dollars in repair bills.

The main question to be decided under Illinois law when a contract provides with the options of repair, replace or refund of the purchase price is whether the remedy "fails of its essential purpose." *A&S Tech. Sys., Inc. v. Coherent Radiation*, 583 F.2d 933, 940 (7th Cir. 1978). This failure typically occurs when the remedy "fails to put the goods in their warranted condition." *Sunny Indus., Inc. v. Rockwell Int'l Corp.*, 1999 U.S. App. LEXIS 7001 (7th Cir. 1999).

In summary, the goods were a state-of-the-art printing press which cost approximately $3.6 million. The Press required constant repairs although it performed at diminished capacity. Suit was filed after approximately a year-and-a-half of press usage. Given the never-ending list of problems with the printer and the failure in the attempts to correct them, it was a reasonable time for Sandy Alexander to sue.

## MATTER OF BAD FAITH CONDUCT

Special Master Prince's Report addressed the question of whether Manroland acted in bad faith in breaching the Contract between the Parties. Mr. Prince devoted approximately seven pages of his Report to that topic and listed several reasons based on the evidence why he believed it did act in bad faith.

One of the reasons relied on by Mr. Prince was Manroland's refusal to replace the Press with a new one after it became clear the Press was experiencing constant breakdowns. Although costly to repair the many service calls by Sandy Alexander,

Manroland refused to make the replacement that Sandy Alexander was willing to accept. In the view of Mr. Prince, he believed that the Manroland Evo models were plagued with problems and that this was reflected with nine presses of the same model throughout the world having major issues. The Special Master believed that the best thing to do was for Manroland "to take the press to the factory for full inspection and repair and then resell it as a used press to a dealer." This was particularly true after the Press suffered a perfecter crash on April 17, 2018.

Included as other examples of bad faith by Manroland were attempts to intimidate Special Master Prince during his inspection of the Press, concealing from Sandy Alexander information about repairs to the Press, and blaming Sandy Alexander for Press malfunctions that it determined were caused by defects in the construction and repair of the Press. All these failings on the part of Manroland are reflected and itemized in the Special Master's Report.

Sandy Alexander has asserted that it has suffered immeasurably from Manroland's breach of the Contract in several ways. The frequency of the Press breakdowns, the extended periods of non-usage, and the general unreliability of the Press, all have produced measurable and non-measurable consequences to its business. With the track record of repairs that any potential buyer would necessarily want to see before making any offer, coupled with its history of unreliability, any value the Press may currently possess is speculative.

Given that history, Sandy Alexander claims it loses money every day the Press

20

does not perform in accordance with the Contract. The Contract remedy does not expressly provide for consequential damages, making it more difficult to determine, with any degree of reasonable certainty, the total measurable financial impact on Sandy Alexander due to the problems with the Press. The angst caused to the management and employees of Sandy Alexander, while not measurable, is nevertheless real.

Special Master Prince determined that Sandy Alexander did not obtain value from the use of the Press. Any benefits derived were offset by its detriments. This is what he wrote:

> As to value Sandy Alexander received from the press is very questionable when you balance the loss of profit, downtime, constant changing of schedules, remaking plates, constant management attention, customer disappointment, farming out work, additional press wash ups, and on and on.

The case of *Sunny Industries* is about a sophisticated state-of-the-art press which experienced colossal breakdowns not unlike those described here. And like the Contract here, there was no provision for consequential damages. The Seventh Circuit's opinion reflects the following observation:

> It is unusual for a remedy to fail of its essential purpose, but this typically occurs when a contract's primary remedy is repair or replacement of defective parts, and this remedy fails to put the goods in their warranted condition. (Citations omitted) . . . It is when these remedies are ineffectual or the seller fails to live up to the remedy's provisions, thereby depriving the buyer of the benefits of the bargain, that remedies fail of their essential purposes.

It is beyond reasonable doubt that Manroland's many efforts at repair and replacement, and at considerable cost, have failed to put the Press in its warranted

condition.  Try as it might, and as often as summoned, Manroland has failed to provide a reasonable Press to Sandy Alexander.

The Court adopts as its own the Report of Special Master Raymond J. Prince and his findings and conclusions.  Although it does not contain some data intended by him to be added nor any commentary he may have offered to the Parties' own comments to the Report, it is otherwise complete, thorough, well-reasoned and well-founded.  Special Master Prince's credentials as an expert in the field of printing are unquestioned and unquestionable.  As his last professional service rendered in a field he clearly loved and obviously excelled in, the Report was worthy of his background, skill, and proficiency.

The evidence indisputably established never-ending problems with the Press and the failure by Manroland to solve them.  As noted by the Special Master, "Sandy Alexander used the press approximately 40% of the time from install."  Report at 20. He concluded that "the sad part of that statement is that one could not predict when the press would be up and running."  Simply put, the Press was unreliable.  No reasonable jury could find otherwise.

It is worthy of note that it was Manroland who urged the Court to employ the services of a Special Master to find the facts and determine conclusions as opposed to trying the case with a jury as soon as possible.  Manroland obviously recognized the skill and talent possessed by Special Master Prince in putting his name forward, as did Sandy Alexander.  Nothing in the entirety of this record suggests that he was unworthy of the reputation he had earned through the years or that he acted in derogation thereof.

The concept of due process requires a fair and full opportunity to present your case and have it decided by a person or persons of integrity and learning. In the Court's view, that happened here. The *de novo* review has now been completed.

## CONCLUSION

The Court hereby orders that Defendant Manroland, Inc. issue a refund to Sandy Alexander, Inc. and the Press shall be returned to Manroland, Inc. It is so ordered.


Dated: 12/8/2020


Charles P. Kocoras
United States District Judge